Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 20, 2007            Decided July 24, 2007

No. 06-7095

MILAN JANKOVIC, *A/K/A* PHILIP ZEPTER, ET AL.,
APPELLANTS

v.

INTERNATIONAL CRISIS GROUP, A NON-PROFIT
ORGANIZATION, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01198)

———

*William T. O'Brien* argued the cause for appellants.  With him on the briefs were *Lisa M. Norrett* and *Malcolm I. Lewin*.

*Amy L. Neuhardt* argued the cause for appellees.  With her on the brief were *Jonathan L. Greenblatt* and *Cynthia P. Abelow*.

Before: ROGERS, GRIFFITH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  In this diversity action, Milan Jankovic, who goes by the name Philip Zepter, and two of his related business entities — Fieldpoint B.V. and United Business Activities Holding, A.G. — appeal the dismissal of their complaint for defamation, tortious interference with business expectancy, and false light invasion of privacy against International Crisis Group ("ICG") and one of its employees, James Lyon.  At issue are three documents that allegedly link Philip Zepter and his business interests to Serbian president Slobodan Milosevic, who was put on trial as a war criminal before his death.  The district court found that the presence of Lyon in the case destroyed diversity.  After the complaint was amended to exclude Lyon, the district court, applying District of Columbia law, dismissed claims relating to two of these documents — a report authored by ICG ("Report 141") and an email sent by Lyon — because the statute of limitations had expired.  The district court dismissed the remaining claims after finding that the third document, ICG's Report 145, was not capable of defamatory meaning and could not support claims for the related torts.  We affirm the district court's dismissal of the original complaint and its dismissal of the claims relating to Report 141 and the Lyon email.  However, because one of the passages in Report 145 is capable of defamatory meaning, we reverse the dismissal of the amended complaint in part.

## I.

ICG is a nonprofit organization registered under District of Columbia law whose mission is "to prevent and resolve deadly conflict."   To this end, it produces analytical reports,

newsletters, briefing papers, and other publications targeted at influencing and advising international decisionmakers. Among these publications are two reports. On March 18, 2003, a report entitled *Serbia after Djindjic* was issued bearing the ICG logo above the words "Belgrade/Brussels." This report, numbered 141, recommends various reforms in the wake of the assassination of the Serbian premier. Report 145, issued July 17, 2003, is a follow-up entitled *Serbian Reform Stalls Again*, again with the ICG logo and "Belgrade/Brussels" on the cover. Both reports reference Philip Zepter, the individual, as well as the Zepter Group of businesses. Citing Belgrade media sources, Report 141 asserts that the Zepter Group "allegedly provides cover for money laundering and weapons shipments." Report 145 lists Philip Zepter as a member of the "new Serbian oligarchy" that benefitted from close ties to Milosevic and continues to prosper through unchecked access to public resources. Additionally, according to the amended complaint, James Lyon sent an email that disseminated a six-paragraph article of unknown origin that reported that "Zepter operated in front companies for State Security, . . . smuggling weapons (to Al-Qaeda among others) and laundering money." Lyon was ICG's "main investigator and Project Director for the Balkans" and the "Director of ICG Serbia" when Reports 141 and 145 were issued.

Philip Zepter and the corporations (collectively "Zepter") filed suit on January 12, 2004, in the Court of First Instance of Brussels, Belgium. The complaint named James Lyon of Provo, Utah, and "[t]he non-profit association INTERNATIONAL CRISIS GROUP, in short ICG, entered in the register of enterprises . . . with registered office located in . . . BRUSSELS." However, as Zepter would later learn, this was not the non-profit organization responsible for the publications. According to Zepter's amended complaint, "[i]n responding initially, in Brussels, to the Brussels Action complaint, ICG for

the first time represented that there were two ICG corporate entities, one in Brussels and another in the United States." Am. Compl. ¶ 72. In response to an action under 28 U.S.C. § 1782 to conduct discovery in the United States for the Belgian action, filed on June 18, 2004, Zepter learned that the organization it sued in Belgium, which is incorporated under Belgian law, is distinct from the International Crisis Group that employs Lyon and issued Reports 141 and 145. As ICG now explains, it is incorporated in Washington, D.C., but headquartered in Brussels, with offices worldwide. *See* Appellees' Br. at 3. The Belgian entity, which it calls International Crisis Group Agence Internationale Sans but Lucratif ("AISBL"), is "an inactive corporation" with "no paid employees and . . . no responsibility for publishing ICG's reports." *Id*. at 4.

On July 15, 2004, Zepter filed a complaint in the United States District Court for the District of Columbia against ICG incorporated here. On August 23, 2005, the district court dismissed that complaint without prejudice on the ground that it was clear Lyon is domiciled in Belgrade — and not Provo, Utah — therefore destroying complete diversity because a stateless citizen is not diverse with an alien like Zepter. Alternatively, the district court noted that it was clear the court lacked personal jurisdiction over Lyon. On September 15, 2005, Zepter filed an amended complaint that removed Lyon as a defendant. ICG moved to dismiss, and on May 1, 2006, the district court granted the motion, finding that the statute of limitations had expired, without any valid defenses, as to Report 141 and the Lyon email and that the claims related to Report 145 failed as a matter of law. *See Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165 (D.D.C. 2006).

**II.**

Zepter first contends that the district court erred by dismissing the original complaint for want of subject-matter jurisdiction because Lyon is actually domiciled in Utah, and because the district court should have authorized jurisdictional discovery to prove this point. We need not resolve these disputes, however, because Zepter does not challenge on appeal the district court's alternative ruling that Lyon lacked sufficient ties to the District of Columbia to warrant an exercise of personal jurisdiction. Personal jurisdiction is "'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Employers Reins. Corp. v. Bryant*, 299 U.S. 374, 382 (1937)). A complaint may be dismissed for lack of personal jurisdiction without settling whether subject-matter jurisdiction exists. Because Zepter has waived any challenge to personal jurisdiction by failing to raise the issue, *see Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990), this court cannot upset the district court's dismissal of the original complaint.

Under District of Columbia law, which applies to this diversity action, claims of defamation are subject to a one-year limitations period. D.C. CODE § 12-301(4). No statutory period is provided for tortious interference with business expectancy or false light invasion of privacy, but where, as here, "a stated cause of action is 'intertwined' with one for which a limitations period is prescribed, [courts operating under District of Columbia law] apply the specifically stated period." *Mittleman v. United States*, 104 F.3d 410, 415 (D.C. Cir. 1997).

Only Report 145 was published within a year of the initiation of this lawsuit on July 15, 2004. Zepter contends,

however, that there is a valid defense to the statute of limitations under the doctrines of lulling, equitable tolling, and equitable estoppel. Alternatively, Zepter maintains that the foreseeable republication of ICG's reports on the Internet resets the one-year clock. The district court rejected these defenses and our review is *de novo*. *See Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003). We agree with the district court.

A defendant who engages in "inequitable conduct" can be equitably estopped from invoking the statute of limitations. *Id.* at 278. Zepter contends that the doctrine applies here because ICG "*actively concealed* the identity of the authorship of the Publications at issue and thwarted the Zepter Plaintiffs' discovery attempts." Appellants' Br. at 23. At the motion-to-dismiss stage, the court must accept this allegation as true. *See Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996) (per curiam). Nonetheless, ICG is not equitably estopped from pleading the statute of limitations. District of Columbia law distinguishes between a party that conceals the existence of a cause of action and a party that conceals its own identity. Under *Chappelle's Estate v. Sanders*, 442 A.2d 157, 158-59 (D.C. 1982), equitable estoppel encompasses only the former. The *Chappelle* rule remains the law of the District of Columbia. *See Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 773-74 (D.C. 1998); *Diamond v. Davis*, 680 A.2d 364, 380 n.14 (D.C. 1996). Zepter does not maintain that ICG did anything to conceal the existence of Zepter's claim.

The similar doctrine of equitable tolling does not concern the conduct of the defendant but rather applies when the plaintiff "despite all due diligence . . . is unable to obtain vital information bearing on the existence of his claim." *Chung*, 333 F.3d at 278 (quoting *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1367 (D.C. Cir. 1998)). This defense of Zepter's fares no better, as the District of Columbia

Court of Appeals has made clear that "good-faith mistakes of forum" do not qualify for equitable tolling even if "the defendant was on notice of the claim as of the initial filing in an improper forum that occurred within the limitations period." *Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C. 1996) (per curiam).

Similar to equitable estoppel, the doctrine of lulling applies when the defendant "ha[s] done something that amounted to an affirmative inducement to plaintiffs to delay bringing action," *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (quoting *Hornblower v. George Wash. Univ.*, 31 App. D.C. 64, 75 (1908)), as when a defendant promises to settle a dispute outside of court, *see, e.g.*, *id.* at 939; *East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 156-57 (D.C. 1998). At most, Zepter contends that ICG's *inaction* delayed its filing of this lawsuit. Because Zepter alleges no specific act of affirmative inducement, the doctrine of lulling is unavailing.

Finally, Zepter maintains that foreseeable republication of a libelous document by a third-party resets the limitations clock and that the district court should have allowed discovery "to enable [Zepter] to ascertain the dates of those republications and present them to the [district court]." Appellants' Br. at 35. Like most common-law jurisdictions, the District of Columbia has adopted the modern "single publication" rule regarding the accrual of libel claims. *See Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 298 n.2 (D.C. 2001); *Ogden v. Ass'n of U.S. Army*, 177 F. Supp. 498 (D.D.C. 1959); RESTATEMENT (SECOND) OF TORTS § 577A. Thus, "for purposes of the statute of limitations in defamation claims, a book, magazine, or newspaper has one publication date, the date on which it is first generally available to the public." *Mullin*, 785 A.2d at 298 n.2. Copies of the original are still part of the single publication but republication in a new edition creates a new publication on the

rationale that the intent is to reach a new audience. *See* RESTATEMENT § 577A cmt. d & illus. 5-6.

The District of Columbia courts have not specifically applied the single publication rule to the posting of identical material by a third-party on the Internet. Courts in other jurisdictions have applied the single publication rule to allegations of defamation on the Internet but have not addressed republication on third-party websites. *See In re Davis*, 347 B.R. 607, 611-12 (W.D. Ky. 2006); *Churchill v. State*, 876 A.2d 311, 316-19 (N.J. Super. Ct. App. Div. 2005); *Firth v. State*, 706 N.Y.S.2d 835, 842-43 (Ct. Cl. 2000). The single publication rule was designed as an accommodation to new forms of communication, and in applying the rule to the Internet, the court must be mindful of the rule's purpose, which according to the Restatement consists of "avoiding multiplicity of suits, as well as harassment of defendants and possible hardship upon the plaintiff himself." RESTATEMENT § 577A cmt. d. Here, Zepter alleges that, as a result of ICG's distribution of Report 141, its defamatory language has been "incorporated in and further disseminated through various other websites and publications." Am. Compl. ¶ 65. In the print media world, the copying of an article by a reader — even for wide distribution — does not constitute a new publication. *See* RESTATEMENT § 577A cmt. d & illus. 6. The equivalent occurrence should be treated no differently on the Internet. At best, the third-party reproductions alleged by Zepter constitute "mere continuing *impact* from past violations [that] is not actionable" as a new cause of action, *Knox v. Davis*, 260 F.3d 1009, 1013-14 (9th Cir. 2001) (internal quotation marks omitted) (citing *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980)). Notably, Zepter does not allege that ICG updated the content of Report 141 or took steps beyond its initial publication to expand the audience for its Report, and the court need not address these possibilities. *See* Sapna Kumar, Comment, *Website Libel and the Single Publication Rule*, 70 U.

CHI. L. REV. 639, 657-61 (2003). Based on Zepter's allegations, ICG can be held to account for only a single publication of Report 141, but these claims are time-barred.

## III.

This leaves only the claims stemming from Report 145, entitled *Serbian Reform Stalls Again*, which was issued on July 17, 2003. Zepter faults three passages in the 28-page report that reference "Zepter Banka," "Filip Zepter," and "a Zepter company," respectively. Report 145 does not mention either of the corporate appellants, Fieldpoint B.V. or United Business Activities Holding, A.G.

A plaintiff claiming defamation must show:

> (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Croixland Props. L.P. v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999) (quoting *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 n.2 (D.C. 1997)). As a threshold issue, Zepter contends that ICG relied upon exhibits beyond the scope of the amended complaint, and the district court's reliance, in turn, would require converting the Rule 12 motion to a Rule 56 summary judgment motion and affording discovery to Zepter. The extrinsic evidence, however, is public record information from Zepter's filings in New York seeking discovery in the

10

Belgian action. Zepter opposes consideration of what he himself filed in court. However, such materials may properly be considered on a motion to dismiss. *See Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222-23 (D.C. Cir. 1993). Turning, then, to the merits of the district court's dismissal, the passages in Report 145 raise distinct issues.

**A.**

The first passage appears in a discussion of the continued influence of the Bezbednosno-Informativna Agencija ("BIA"), Serbia's state-security agency. The passage reads:

> The BIA as a whole is deeply compromised by criminal activities as well as numerous other illegal actions under Milosevic. It appears to have shadowy connections to at least two banks — Komercijalna Banka and Kapital Banka — and maintains close ties with a third, Zepter Banka. It has been involved in the weapons trade, through such front companies as Grmec. Its most dangerous component is the so-called military line, composed of former [Serbian Counterintelligence] officers who transferred from the army in the early 1990s. Many of these are engaged in economic activities connected to some of the mentioned banks.

Report 145, at 15 (footnotes omitted). The district court concluded that this statement was not "concerning the plaintiffs" because it references Zepter Banka instead of Philip Zepter, Fieldpoint, or United Business. *Jankovic*, 429 F. Supp. 2d at 174-76.

"To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the

plaintiff is never named or is misnamed." *Croixland*, 174 F.3d at 216. In *Croixland*, the defendants stated that the owner of a race track was "connected to organized crime" but misidentified the race track owner. *Id.* at 215-16. This court held that a complaint filed by the actual race track owner should not be dismissed because "[e]ven if the lobbyists misidentified the owner of the facility, it did not remove the taint to the true owner," especially after "[d]rawing favorable inferences for the non-moving party and viewing the alleged remarks from the perspective of the listeners." *Id.* at 217 (citations omitted). An action could also have been sustained by the company named in the statements that did not actually own the race track. *See Peck v. Tribune Co.*, 214 U.S. 185, 188-89 (1909).

As the district court recognized, the first passage of Report 145 neither mentions Philip Zepter directly nor refers to him indirectly, except to the extent that he shares a name with his company. So *Croixland* does not help Philip Zepter; rather, the question is whether the namesake of a corporation can be defamed when false misdeeds are attributed to his company. In the reverse situation, the Restatement provides that "[a] corporation is not defamed by communications defamatory of its officers, agents or stockholders unless they also reflect discredit upon the method by which the corporation conducts its business." RESTATEMENT § 561 cmt. b.

Stated generally, "[d]efamation is personal; . . . [a]llegations of defamation by an organization and its members are not interchangeable. Statements which refer to individual members of an organization do not implicate the organization. By the same reasoning, statements which refer to an organization do not implicate its members." *Provisional Gov't of New Afrika v. ABC, Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (citation omitted). This principle is not absolute, of course. If, for example, one person is solely in charge of corporate decision

12

making, an attack on a corporation would vicariously attack the decision maker. *See, e.g.*, *Brayton v. Crowell-Collier Publ'g Co.*, 205 F.2d 644, 645 (2d Cir. 1953); *Caudle v. Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1996). But matters that might "reflect[] poorly upon an individual" are not necessarily "concerning" that person. *Patzer v. Liberty Commc'ns, Inc.*, 650 P.2d 141, 143 (Or. Ct. App. 1982).

Applying this standard, the first excerpt concerns neither Fieldpoint nor United Business. Their connection is that Fieldpoint owns the Zepter trademarks and United Business distributes Zepter products under these trademarks. Fieldpoint and United Business are essentially investors in the Zepter name. But "[t]he mere fact that a publication might injure the investors in a business does not give rise to a claim for defamation in those investors unless the publication appears to refer to the investors individually." *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1005 (4th Cir. 1990).

Nor could the excerpt be deemed to concern Philip Zepter personally. The amended complaint emphasizes the expansiveness of the Zepter enterprise:

> [t]he Zepter Group is now a global enterprise with sales through separate companies based in more than fifty countries on five continents across the world, and with a network of more than 2,500 regular employees, 100,000 sales consultants, eighty-nine shops, and more than fifty pavillions located in major cities throughout the world.

Am. Compl. ¶ 14. Accepting this as true, it cannot be the case that a reasonable reader of the first excerpt of Report 145 would conclude that Philip Zepter personally had engaged in illicit

13

activities simply because a bank bearing his name — one of many banks in the Zepter Group, *see id.* ¶ 24 — "maintains close ties with" Serbian state security.[1]

**B.**

The second passage discusses the "New Serbian Oligarchy." Three paragraphs are relevant:

> The unwillingness to continue the crackdown reflects the power of the Milosevic-era financial structures that — with the rigid oversight once provided by the dictator removed — have transformed themselves into a new Serbian oligarchy that finances many of the leading political parties and has tremendous influence over government decisions. Some of the companies were originally formed as fronts by the State Security or Army Counterintelligence (KOS), while others operated at the direct pleasure of the ruling couple. Under Milosevic, many of these companies profited from special informal monopolies, as well as the use of privileged exchange rates. In return, many of them financed the regime and its parallel structures.

---

[1] Alternatively, Zepter contends that he should have been allowed to amend his complaint a second time in order to allege additional facts. ICG responds that Zepter never requested leave to amend in the district court, and Zepter offers no reply. Zepter does not seek to amend the complaint to assure the court of its jurisdiction. *See* 28 U.S.C. § 1652; *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 469 F.3d 129, 132 (D.C. Cir. 2006). Therefore, because Zepter did not raise this issue before the district court, it has been waived. *See Yee v. City of Escondido*, 503 U.S. 519, 533-38 (1992); *District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984).

Some of the individuals and companies are well known to average Serbs: [fifteen individuals and their companies, including] Zepter (Milan Jankovic, aka Filip Zepter) . . . are but some of the most prominent. Because of the support they gave to Milosevic and the parallel structures that characterised his regime, many of these individuals or companies have at one time or another been on EU visa ban lists, while others have had their assets frozen in Europe or the US.

In the popular mind, they and their companies were associated with the Milosevic regime and benefited from it directly. The [Democratic Opposition of Serbia] campaign platform in September 2000 promised that crony companies and their owners would be forced to answer for past misdeeds. Few of the Milosevic crony companies have been subjected to legal action, however. The enforcement of the 'extra-profit' law is often viewed as selective and there have been only a handful of instances in which back taxes, perhaps 65 million Euros worth, have been collected. Most disturbing is the public's perception that — at a time when the economy is worsening — these companies' positions of power, influence and access to public resources seem to have changed very little.

Report 145, at 17-18 (footnotes omitted).

Again, this passage makes no mention of Fieldpoint or United Business. The broad mention of Zepter is not sufficient to render the passage defamatory as to Fieldpoint and United Business. "When a statement refers to a group, a member of that group may claim defamation if the group's size or other

circumstances are such that a reasonable listener could conclude the statement referred to each member or 'solely or especially' to the plaintiff." *Browning v. Clinton*, 292 F.3d 235, 247 (D.C. Cir. 2002) (quoting *Serv. Parking Corp. v. Wash. Times Co.*, 92 F.2d 502, 506 (D.C. Cir. 1937)). The Zepter Group is an expansive global enterprise, and there are no indications that Fieldpoint or United Business were "solely or especially" targeted by this statement.

As to Philip Zepter, this passage presents questions about what qualifies as a defamatory statement. When confronted with a motion to dismiss, a court must evaluate "[w]hether a statement is capable of defamatory meaning," a question of law. *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001). Applying District of Columbia law, "[a] statement is 'defamatory' if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Moss v. Stockard*, 580 A.2d 1011, 1023 (D.C. 1990). An "allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear 'odious, infamous, or ridiculous.'" *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984). The district court concluded that this passage "does not rise to the 'odious, infamous, or ridiculous' level." *Jankovic*, 429 F. Supp. 2d at 178.

Although this passage has numerous qualifiers — for example, the Report says only that "some" of the companies were fronts for state security — we are unable to say that a reader of this passage could not reasonably conclude that Philip Zepter, personally, was a "crony" of Milosevic who supported the regime in exchange for favorable treatment. *See Heard v. Johnson*, 810 A.2d 871, 886 (D.C. 2002). If this tie is sufficiently "odious, infamous, or ridiculous," then the complaint has properly stated a cause of action for defamation.

The district court concluded that because Report 145 does not mention "war crimes or ethnic cleansing by Milosevic or the Serbian Government," the "allegations of mutual support" should be described as "political, not criminal" and therefore not capable of defamatory meaning. *Jankovic*, 429 F. Supp. 2d at 177. Merely associating somebody with a foreign government would not ordinarily be defamatory, but in *Southern Air Transport, Inc. v. ABC, Inc.*, 877 F.2d 1010 (D.C. Cir. 1989), this court acknowledged that "[a]n inference that [a plaintiff company] was engaged in dealings with the [apartheid] government of South Africa clearly would have a defamatory meaning because of the intense antipathy felt by a great number of Americans towards South Africa." *Id.* at 1015. In that light, the passage could lead a reasonable reader to conclude that Philip Zepter was actively in alliance with Milosevic and his regime, and so, Philip Zepter has made sufficient allegations to establish a prima facie case of defamation. ICG objects, however, that various privileges and protections defeat Zepter's claims, and we will remand the claims related to this second passage for the district court, in the first instance, to address the applicability and merits of the Opinion and Fair Comment Protection, the Fair Report Privilege, or the Neutral-Reportage Doctrine.

## C.

The third passage is brief:

> Two other individuals with close ties to Milosevic-era financiers hold key positions of influence within the Premier Zivkovic's cabinet. The chief of staff, Nemanja Kolesar, is a former employee of Delta, while Zoran Janjusevic, an advisor, is a former employee of both State Security and a Zepter company.

Report 145, at 18. The amended complaint alleges that it was defamatory to assert that Philip Zepter "holds a key position of influence." Am. Compl. ¶ 59. However, Zepter appears to misread the passage, which refers to "a former employee of . . . a Zepter company," not to Philip Zepter himself. Hence, this statement is not "of and concerning" Philip Zepter, Fieldpoint, or United Business, and the district court was correct to dismiss the related allegations.

### D.

In addition to his defamation claims, Zepter alleges tortious interference with business expectancy and false light invasion of privacy. Am. Compl. ¶¶ 95-119. The district court found that "because all of the plaintiffs' claims are rooted in the same alleged defamatory conduct, they must all be dismissed for the reasons their defamation claims cannot be maintained." *Jankovic*, 429 F. Supp. 2d at 179. As to the first and third excerpts in Report 145, this is true; statements not concerning a plaintiff do not affront privacy rights or business expectancies. However, as to the second excerpt, the standards for defamation and false light privacy are not identical.

The District of Columbia follows the Restatement position that:

> To prevail on a false light claim under District of Columbia law, appellant must show that (a) the published material places appellant in a false light which "would be highly offensive to a reasonable person," and (b) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Weyrich*, 235 F.3d at 628 (quoting RESTATEMENT § 652E). Thus, "before finding that a statement is not actionable, because it is not reasonably capable of defamatory meaning, [the district court] must also satisfy itself that the statement does not arguably place appellant in a 'highly offensive' false light." *Id.*

Accordingly, we affirm the district court's dismissal of the original and amended complaints, except that we reverse and remand as to claims of defamation, false light invasion of privacy, and tortious interference with business expectancy relating to the second passage of Report 145 as applied to Philip Zepter personally.